IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SCOTT CARTER,<br><br>                      Plaintiff,<br>vs.<br><br>CITY OF POST FALLS, IDAHO, CITY OF POST FALLS POLICE DEPARTMENT, MAYOR CLAY LARKIN, CHIEF OF POLICE CLIFFORD T. HAYES, LT. HAUG, OFFICER BRANTL, OFFICER SMITH, OFFICER MOSS, OFFICER SCHMECKPEPER, SGT. FORSYTH, and DOES 1-100,<br><br>                      Defendants. | CASE NO. CIV 08-00488-EJL<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

      Plaintiff Scott Carter seeks damages pursuant to 42 U.S.C. §§ 1983 and 1985 for alleged violations of his Fifth, Eighth and Fourteenth Amendment Rights stemming from a traffic stop and arrest. Before the Court are the parties' cross motions for summary judgment. Defendants argue they are entitled to summary judgment because their actions were reasonable or, in the alternative, they are entitled to qualified immunity.

I.    **Background**

      Plaintiff's claims arise from his arrest for driving under the influence of alcohol and eluding a police officer on the night of October 30, 2007. Many of the facts are disputed, but the following are not. On the night in question, Officer Brantl of the City of Post Falls Police Department observed Plaintiff driving his truck on Interstate 90 and suspected he was drunk. In fact he was: Plaintiff's

blood alcohol level was later determined to be .26 percent. Brantl activated his siren, and also shone a bright spotlight into Plaintiff's truck to get him to stop. Rather than pull over on the shoulder, Plaintiff continued driving for approximately two miles. He eventually exited the freeway and stopped in a nearby parking lot. In the meantime, other officers had joined in the pursuit. The officers, with their guns drawn, ordered Plaintiff numerous times to unlock his doors and step out of his truck. Plaintiff refused. The officers broke his passenger-side window, unlocked his doors, and pulled him out. Plaintiff's face hit the pavement and he sustained injuries.

Whether Plaintiff was recklessly leading Brantl on a pursuit on Interstate 90 or patiently looking for a safe place to stop is ostensibly in dispute. The Defendants maintain Plaintiff was swerving in his lane and coming dangerously close to other vehicles. Even after exiting the freeway, he made several turns onto side streets and finally stopped in an unlit restaurant parking lot. Plaintiff tells a different story: He immediately slowed down when Officer Brantl activated his siren, put no other motorists in danger, and "was merely seeking a safe place to stop outside of traffic and off the freeway." (Pl.'s Summ. J. Br., 3.) At argument, Plaintiff's counsel maintained Plaintiff thought stopping on the Interstate was illegal, although he conceded in fact it was not. Even assuming Plaintiff's version is correct, however, there is no evidence the pursuing officers knew why he was refusing to pull over on the highway or side streets, or why he led them to a darkened parking lot.

Once he had stopped his truck and was surrounded by police, Plaintiff claims he was given a Hobson's choice in the form of conflicting orders to "continue showing his hands in the air" and lowering his hands to unlock his door. According to Plaintiff, by "bravely" obeying the first order he "saved his life." (Pl.'s Summ. J. Br., 5.) Whether he was truly confused or simply intoxicated and slow, Plaintiff failed to unlock his truck door when told to do so. Defendants testified this is why they smashed his passenger window with a baton and opened the doors themselves.

The Defendants portray Plaintiff as belligerent and themselves as cool and by-the-book; Plaintiff's pleadings paint the opposite picture. For example, the Defendants claim Plaintiff said "I'm not going anywhere" when his truck door was finally open. (Def.'s Statement of Facts, ¶ 13.) Plaintiff, by contrast, argues "there is no evidence that Scott Carter had [any] intention to resist arrest." (Pl.'s Summ. J. Br., 4.)

The parties offer widely divergent descriptions of Plaintiff being removed from his truck and ultimately injuring his face. The Defendants say Plaintiff was "pulled" from his truck which "resulted in a momentum that carried Carter to the ground." Plaintiff, on the other hand, says he was "roughly grabbed and violently thrown headfirst to the pavement from the high altitude of his large four wheel-drive pickup." (Pl.'s Summ. J. Br., 5.) He says his face was "bloodily pulverized." (Pl.'s Summ. J. Br., 9.) Plaintiff himself does not remember how it happened; his only knowledge comes from watching the video captured by the police car dashboard camera after the fact.

Plaintiff had to be taken to the Kootenai County Medical Center for medical attention before the county jail would admit him. An hour and a half later, after being treated, he was returned to the jail. Defendants contend Plaintiff's injuries are limited to cuts that are now completely healed, while Plaintiff claims to have suffered "traumatic brain injuries" and undergone treatment for "post-concussion syndrome" one month after his arrest.

It is important to note that Plaintiff's side of the story, conveyed above, is taken entirely from his pleadings. Their only evidentiary counterpart is twelve nonsequential pages of Plaintiff's deposition testimony, which do not bear out his allegations. While the Defendant police officers submitted affidavits with their summary judgment motion that confirm the motion's version of events, Plaintiff did not – and likely could not, given his lack of memory.

## II.   Legal Standards

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is he required to offer evidence negating the non-movant's claims. *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989). However, the moving party does bear the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 US. at 323. Once the moving party has met that burden, it shifts to the non-moving party, who must then present evidence showing there is a genuine issue for trial. *Id.* at 323–24.

"When the non-moving party bears the burden of proof at trial, summary judgment is warranted if the non-movant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (citations, internal quotations, and alterations omitted). The "mere existence of a scintilla of evidence" in support of the non-moving party's position is not sufficient to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Accordingly, the nonmoving party cannot oppose a properly supported summary adjudication motion by "rest[ing] on mere allegations or denials in his pleadings." *Id.* at 256. The non-movant must go beyond the pleadings to designate specific facts showing that there are genuine factual issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. The Court does "not give credence to empty rhetoric but credit[s] only those assertions that are supported by materials of evidentiary quality." *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 2 (1st Cir. 1999).

**B.    Excessive Force**

Because Plaintiff's claim arises in the context of an investigatory traffic stop, he is protected by the Fourth Amendment from the use of excessive force by police. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment permits police to use only such force as is "objectively reasonable" under the circumstances. *Id.* at 397. Thus, Plaintiff's Constitutional rights would not be violated by an objectively reasonable application of force.

Objective reasonableness is judged "in light of the facts and circumstances confronting" officers at the time. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006). The Court "consider[s] the facts underlying an excessive force claim from the perspective of a reasonable officer on the scene . . . ." *Id.* (citing *Graham*, 49 U.S. at 397). "Determining whether a particular use of force is reasonable requires a fact-finder to balance the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Boyd v. Benton County*, 374 F.3d 773, 778–79 (9th Cir. 2004) (citation and internal quotation marks omitted). An excessive force analysis requires evaluating the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Arpin*, 263 F.3d at 921. This list is not exhaustive and has been supplemented with other factors, such as whether the plaintiff was sober, the availability of alternate methods for subduing the plaintiff, and other dangerous or exigent circumstances. *Chew v. Gates,* 27 F.3d 1432, 1440 n.5 (9th Cir. 1994).

The Supreme Court has also made clear "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  Officials "need not avail themselves of the least intrusive means of responding," and are only required to act "within that range of conduct [the Court identifies] as reasonable." *Billington v. Smith*, 292 F.3d 1177, 1188–89 (9th Cir. 2002).

The Ninth Circuit has cautioned that summary judgment in excessive force cases should be granted sparingly. *Boyd*, 374 F.3d at 779 (citation omitted). The propriety of a particular use of force is generally, but not always, a question for the jury rather than the Court. *Compare, e.g., Santos v. Gates*, 287 F.3d 846, 856 (9th Cir. 2002) (reversing trial court's grant of summary judgment to defendants) with *Kitts v. Zaugra*, 250 Fed.Appx. 787 (9th Cir. 2007) (affirming trial court's grant of summary judgment to defendants, where plaintiff failed to raise triable issue of material fact as to reasonableness of officers' use of force).

### C.     Qualified Immunity

In addition to arguing their use of force was objectively reasonable, Defendants also raise the defense of qualified immunity. Before reaching the issue of qualified immunity, the Court examines the issue of objective reasonableness. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Qualified immunity shields state officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal citations omitted). "The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [his or her actions] to be lawful, in light of clearly established law and the information" the official possessed. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

### III. Discussion

#### A. Plaintiff's Evidence

The evidence Plaintiff has submitted in support of his summary judgment motion and in opposition to that of the Defendants is very thin, and as to certain elements, nonexistent.[1] It consists of court and police records that aren't in dispute, a few pictures of Plaintiff's truck and bloodied face, and 12 nonsequential pages from Plaintiff's deposition. The deposition testimony not only fails to corroborate Plaintiff's allegations as pled in his complaint and recited in his briefs, but it even contradicts some of those allegations outright.

For example, Plaintiff's summary judgment brief claims he was "roughly grabbed and violently thrown headfirst to the pavement from the high altitude of his large four-wheel drive pickup," and his complaint alleges he was "dragged from his car and Defendant Dewitt smashed [his] head face down into the parking lot pavement." These allegations contradict all available evidence, including Plaintiff's own testimony. For instance, Plaintiff testified he was pulled from his vehicle and that the momentum is what carried him to the ground. (Carter Dep. at 73: 3–11.)

Similarly, Plaintiff says in his summary judgment brief that he was "treated for Head Injuries and Concussion and received extensive surgical stitching" at the hospital before being taken to the jail. In his deposition, however, Plaintiff says of his hospital visit, "I just got some stitches." (Carter Dep. at 52:16-23.) Although Plaintiff was treated by medics on the scene and by a doctor at the hospital, and about a month later by his own doctor, there is no evidence other than inadmissible hearsay that any medical professionals ever thought he had suffered a concussion. The only verified injuries were a cut above his eye, which required four stitches, and one to his mouth.

---

[1] Plaintiff writes in his summary judgment brief that "[t]wo videotapes were recorded before and during the Plaintiff's traffic stop and arrest that conclusively demonstrates [*sic*] the supporting facts surrounding Plaintiff's Motion for Summary Judgment." This indicates an awareness on Plaintiff's part of how invested his lawsuit and summary judgment motion are in these police videos, and how little other evidence he has offered.

Although Plaintiff claims that his face was "pulverized," the record evidence demonstrates his injuries were minor with no lasting effect. By the time of his deposition, the cut above his eye had healed to such a degree that he could not identify where it had been. The most he can say of the impact on his livelihood is that he "missed a couple weeks of work," "wasn't able to follow up on some things, " and "[hasn't] been as aggressive or confident in [his] work." (Carter Dep. at 19–20.) With no evidence that he was thrown to the ground and or that he sustained serious injuries, the basis for Plaintiff's excessive force claim quickly begins to evaporate.

Furthermore, Plaintiff had no memory of any of the events from the time police told him to show his hands until he was at the hospital. (Carter Dep. at 52:7–15.) Presumably, then, he has no actual recollection of being given conflicting commands to both show his hands and unlock his door at the same time – demands, it is worth adding, the Court does not necessarily see as conflicting. He also could not have remembered being pulled from the truck.

In sum, aside from the police videos, Plaintiff offers no evidence to support the factual allegations in his complaint and summary judgment briefs. Plaintiff offers no evidence that he was cooperative once he stopped his truck, no evidence that he was violently thrown face-first to the pavement, and no evidence of anything other than minor injuries.

### B.     Other Evidence

Defendants submitted two authenticated videos from the dashboard cameras of police vehicles driven by Defendants Brantl and Smith, respectively. The video from Officer Brantl's vehicle the pursuit and arrest, and the video from Officer Smith's vehicle picks up the pursuit from the point Plaintiff pulled off the highway. Plaintiff agrees these videos accurately represent events that night, and he relies on them.

The video shows Officer Brantl's vehicle leaving the scene of a previous traffic stop and closing in on Plaintiff's large extended-cab truck, turning on his flashing lights, and shining a spotlight into the back window of the truck. For about two minutes, Plaintiff continued driving, occasionally blinking his right signal light and feinting right, but never stopping. Though Plaintiff says he believed he was not allowed to stop on the Interstate, the officers would not have known or suspected this was the reason he refused to pull over.

After Plaintiff exited the freeway, he drove erratically but slowly. On the road leading from the exit ramp there were four lanes, one for U-turns, one for left turns, one for traffic continuing straight ahead, and one for right turns. He chose the lane heading straight, entered the intersection while the traffic light was still red, and made a left turn.

On the videos, it is clear the officers first repeatedly told Plaintiff to show his hands, and then after a pause repeatedly told him to unlock his doors and get out. After smashing the window and unlocking the doors themselves, they only told him to get out. On the Smith video, Plaintiff can be heard telling Officer Smith something like "I'm not gonna go," which is consistent with Smith's declaration. As soon as the driver's door was opened, Officer Smith told Plaintiff he was being pulled from his car, after which an officer (later identified as Officer DeWitt) forcefully pulled Plaintiff out of the driver's seat. At some point during the removal Officer DeWitt also grabbed Plaintiff's right shoulder from behind as he fell. Plaintiff apparently made little effort to break his own fall. The Smith video shows the removal more clearly, but neither it nor the Brantl video show Officer DeWitt or anyone else smashing Plaintiff's face on the ground.

At argument, Plaintiff's counsel attempted to explain Plaintiff's lengthy memory lapse by arguing Plaintiff was "knocked out" when he hit the ground. But the video clearly shows Plaintiff talking, moving his legs, sitting up, standing, walking, and responding to the officers' questions. After Plaintiff's removal from the truck officers were able to observe him closely and confirm their suspicions that he was drunk. (Brantl Decl., ¶ 33.)

In short, the video evidence corroborates Defendants' position, and is inconsistent with Plaintiff's allegations on several key points.

### C.    Use of Force

From the time they began pursuing Plaintiff, the officers believed, with reason, that he was attempting to elude them. Their suspicions were heightened when he bypassed well-lit stopping places and chose to pull into a dark, abandoned parking lot. As they approached his vehicle with weapons drawn, they apparently believed he might be armed. Officer Smith saw him digging for something but then confirmed he was holding a cell phone. Obviously this did not mean there was no weapon in the truck within reach, only that there was no weapon in his hand. The officers' affidavits show they were

concerned for the safety of other drivers on the highway, and were therefore intent on stopping him as soon as safely possible. (Brantl Decl., ¶ 52.) Their affidavits also show that because Plaintiff was driving a large truck, they were concerned he might attempt to force his way out of the parking lot and escape, further endangering other drivers. (*Id.*) They were also concerned Plaintiff might have access to weapons in his truck, and were attempting to get him out of his truck as quickly as possible to minimize the risk. (*Id.*, ¶ 53, Smith Decl., ¶ 17.)

At argument, Plaintiff's counsel, referred to *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002), and argued that merely pointing weapons at Plaintiff constituted excessive force. This claim was never made in the complaint, and it fails as a matter of law. Although Plaintiff is now providing explanations for his erratic, and apparently elusive and uncooperative behavior, the officers at the time had no reason to know what he was thinking. Plaintiff turned out to be unarmed, but Defendants (unlike the officers in *Robinson*) had no way of knowing this at the time. And although he was ultimately not prosecuted for eluding police, the officers (again, unlike the officers in *Robinson*) had no assurance they were dealing with a mere misdemeanant. Their suspicions that he posed a danger of escape, resistance, or possibly armed attack were well-founded based on the information they had at the time. Furthermore, because Carter was apparently intoxicated and behaving erratically, the officers had reason to suspect he might act rashly or unpredictably. The plaintiff in *Robinson*, by contrast, approached the police officers to introduce himself when he saw them outside his house, in broad daylight no less.

There is likewise no evidence the officers' decision to remove Plaintiff from his truck was unreasonable. After being told several times to unlock his doors and get out, and even after his door was opened for him, he did not comply. No other acceptable options were available. Pulling him quickly from the truck, before he could resist or reach for a weapon, was also reasonable. Officer Smith also warned him he was being pulled out. With the benefit of hindsight, the officers might have done more to break Plaintiff's fall, but failing to foresee Plaintiff's own clumsiness is not enough to state a claim for excessive force. Examining the officers' actions in light of *Graham*, 490 U.S. at 396, and *Chew*, 27 F.3d at 1440 n.5, Plaintiff identifies nothing they did that was outside the range of reasonable conduct. *Billington*, 292 F.3d at 1188–89.

It is well established that safety concerns justify requiring a driver to exit his vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977). Officers may forcibly remove suspects who refuse. *See, e.g., Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005); *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002); *Rogala v. Dist. of Columbia*, 161 F.3d 44, 49, 54–55 (D.C.Cir. 1998) (finding level of force objectively reasonable where, after suspect twice refused to exit car, officer reached in and pulled her out, causing bruises and a black eye). For obvious reasons, they are not required to use the least possible amount of force in attempting to do so. *Billington*, 292 F.3d at 1188–89. Faced with a rapidly-unfolding situation, they are required to make quick decisions, *Graham*, 490 U.S. at 396–97, and underestimating the amount of force required to remove and control a potentially dangerous suspect could have tragic consequences.

Because there is no evidence the force Defendants applied was unreasonable under the circumstances, summary judgment for Defendants is appropriate. There is no evidence to support any other claims, such as due process violations, *Monell* liability or conspiracy. Plaintiff has therefore failed to create a triable issue of fact as to any of his claims.

### D. Qualified Immunity

Even if the Court were to find Defendants used excessive force, in light of the information they had, and clearly established law, they had no reason to think their actions were unlawful, and they would therefore be entitled to qualified immunity. *See Anderson v. Creighton*, 483 U.S. at 641.

## IV. Conclusion

Although summary judgment in excessive force cases should be granted sparingly, the Court finds it is justified here. The question Plaintiff's lawsuit presents is whether the police who stopped and arrested him acted in a manner that was objectively reasonable, and on that question Plaintiff has failed to raise a triable issue of material fact. He has failed to offer or point to meaningful evidence that any of several key allegations in his pleadings might be true, particularly the allegation that the police who stopped and arrested him threw him head-first into the ground in such a manner that he sustained serious and lasting injuries. To the contrary, the only evidence presented in this case indicates that the Defendants did only what they had to do to apprehend a drunk driver who wasn't

/ / /

05-354

cooperating with them and who they had reason to believe might be a threat to their safety or the safety of others.

Plaintiff's motion for summary judgment is therefore **DENIED** and Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

DATED: 7-31-09

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge